**130 Nev., Advance Opinion 90**

# IN THE SUPREME COURT OF THE STATE OF NEVADA

STATE OF NEVADA DEPARTMENT
OF BUSINESS AND INDUSTRY,
FINANCIAL INSTITUTIONS
DIVISION,
Appellant,
vs.
CHECK CITY PARTNERSHIP, LLC,
D/B/A CHECK CITY, A NEVADA
LIMITED LIABILITY COMPANY,
Respondent.

No. 62888

FILED

NOV 13 2014



Appeal from a district court order in a declaratory relief action.

Eighth Judicial District Court, Clark County; Kenneth C. Cory, Judge.

*Reversed.*

Catherine Cortez Masto, Attorney General, and Christopher Eccles, Daniel
D. Ebihara, and David J. Pope, Deputy Attorneys General, Carson City,
for Appellant.

Holland & Hart LLP and Patrick J. Reilly and Nicole E. Lovelock, Las
Vegas,
for Respondent.

BEFORE THE COURT EN BANC.

## OPINION

By the Court, PARRAGUIRRE, J.:

NRS 604A.425 limits the amount of a deferred deposit loan to
25 percent of a borrower's expected gross monthly income. In this appeal,
we are asked to determine whether that cap includes only the principal
borrowed or the principal amount plus any interest or fees charged. We

H-37351

conclude that NRS 604A.425 unambiguously provides that the 25-percent cap includes both principal and any interest or fees charged. Accordingly, we reverse the district court's order granting declaratory relief in Check City's favor.

## FACTS

A deferred deposit loan is a transaction wherein a borrower is given a loan that must be repaid in full within a relatively short time frame. The lender generally charges a flat fee based on a very high interest rate. As collateral, the borrower gives the lender a post-dated check that includes the principal amount and any interest or fees to be incurred.[1] The lender then holds that check during the term of the loan. At the end of the loan's term, the borrower may either pay the lender, who will return the post-dated check, or the lender may deposit the check. The loan is for a short, fixed period that cannot exceed 35 days. NRS 604A.408. Loans for longer periods are referred to as "high-interest loans," which are governed by separate provisions of NRS 604A.425. NRS 604A.408(2).

As an example, the record in this case includes a loan agreement under which a customer borrowed $300 and agreed to pay $321 the following week. The federal Truth in Lending Act requires lenders to disclose fees as an annual percentage rate (APR). 15 U.S.C. § 1601 *et seq.* (2012); 12 C.F.R. § 226.17 (2014). According to the loan document, the $21 "Finance Charge" was based on a 1-week loan term and an APR of 364. Nevada does not have a usury law, so there is no statutory cap on interest rates.

---

[1]Instead of a post-dated check, the borrower may provide the lender with a written authorization for an electronic transfer of money from the borrower's bank account. NRS 604A.050(1)(b). We acknowledge both methods but refer only to "checks" for the sake of simplicity.

However, NRS 604A.425 limits the amount of a deferred deposit loan to 25 percent of the borrower's expected gross monthly income. In 2008, the Nevada Financial Institutions Division (FID) began enforcing the 25-percent cap as including both the principal borrowed and interest charged.[2] In two separate Reports of Examination issued to Check City, the FID informed Check City of this interpretation, but did not fine or cite it for issuing loans that violated the FID's interpretation of NRS 604A.425.

In June 2013, Check City filed a complaint for declaratory relief in the Eighth Judicial District seeking clarification of NRS 604A.425. The FID filed a motion to dismiss, arguing that there was no justiciable controversy and Check City had not exhausted its administrative remedies. The district court rejected these arguments and granted Check City's motion for summary judgment, concluding that the 25-percent cap only applied to the principal borrowed. The FID now brings this appeal.

## DISCUSSION

On appeal, the FID argues that the district court erred in concluding that NRS 604A.425's 25-percent cap only refers to the principal borrowed, rather than to the principal plus interest and fees.

---

[2]The FID and another deferred deposit lender, Advanced Check Cashing & Payday Loan (ACC), filed a joint petition for declaratory relief seeking clarification of NRS 604A.425 in 2008. The district court in that case concluded that the 25-percent cap includes both interest and principal. Check City focuses a portion of its argument on the fact that it was not informed of, or included in, the joint petition that the FID filed with ACC. Check City, however, does not argue that it was a necessary party to that case under NRCP 19(a), and it does not provide a legal basis for its argument that it should have been informed of, or included in, the ACC case. Furthermore, the specifics of the ACC case are not material because this case requires de novo review of the relevant statute. Accordingly, we do not address the extensive references Check City makes to being excluded from the ACC case.

We review questions of statutory interpretation de novo. *Estate of Smith v. Mahoney's Silver Nugget, Inc.*, 127 Nev. ___, ___, 265 P.3d 688, 690 (2011). We will not look beyond the plain language of a statute to determine its meaning when the statute is unambiguous. *Id.* "[A] statute is ambiguous when it is capable of being understood in two or more senses by reasonably informed persons . . . ." *Id.* (internal quotation marks omitted). If a statute is ambiguous, this court will look to "'the context and the spirit of the law or the causes which induced the legislature to enact it.'" *D.R. Horton, Inc. v. Eighth Judicial Dist. Court*, 123 Nev. 468, 476, 168 P.3d 731, 738 (2007) (quoting *McKay v. Bd. of Supervisors*, 102 Nev. 644, 650-51, 730 P.2d 438, 443 (1986)). To determine the Legislature's intent, we look to "legislative history, reason, and considerations of public policy . . . ." *Chanos v. Nev. Tax Comm'n*, 124 Nev. 232, 240, 181 P.3d 675, 681 (2008).

The threshold inquiry, then, is whether NRS 604A.425 unambiguously states that the 25-percent cap includes both the principal amount borrowed and any interest or fees charged. NRS 604A.425 provides: "A licensee shall not . . . [m]ake *a deferred deposit loan* that exceeds 25 percent of the expected gross monthly income of the customer when the loan is made." NRS 604A.425(1)(a) (emphasis added). NRS 604A.050 defines "deferred deposit loan" as follows:

> "Deferred deposit loan" means a *transaction* in which, *pursuant to a loan agreement*:
>
> 1. A customer tenders to another person:
>
> (a) A personal check drawn upon the account of the customer; or
>
> (b) Written authorization for an electronic transfer of money for a specified amount from the account of the customer; and

SUPREME COURT
OF
NEVADA

(O) 1947A

2. The other person:

(a) Provides to the customer an amount of money that is equal to the face value of the check or the amount specified in the written authorization for an electronic transfer of money, less any fee charged for the transaction; and

(b) Agrees, for a specified period, not to cash the check or execute an electronic transfer of money for the amount specified in the written authorization.

(Emphases added.)

The district court applied what it considered a plain-language, commonsense meaning for the phrase "deferred deposit loan," concluding that the phrase only encompassed the principal borrowed. However, we find that the language of NRS 604A.050 does not limit deferred deposit loans to just the amount borrowed, as it clearly contemplates that a deferred deposit loan is a *transaction* based on a loan agreement. That loan agreement, in turn, is made up of various terms including both the amount borrowed and any fees charged. Therefore, deferred deposit loans are not limited to just the amount borrowed.

NRS 604A.050 defines "deferred deposit loan" by describing a deferred deposit loan transaction. NRS 604A.050(1) describes the customer's basic obligations, and NRS 604A.050(2) describes the basic obligations of the "other person," typically a licensed lender. When these two subsections are read together, a "deferred deposit loan" is a transaction with three distinctive characteristics that separate it from other types of loan agreements: (1) the customer secures a loan with a check; (2) the lender finances an amount that is equal to the check the customer tendered, minus any fees due to the lender; and (3) the lender holds the

check as security and deposits it only when an agreed-upon date has arrived.

NRS 604A.050 makes clear that the principal amount borrowed is merely one aspect of the larger transaction. NRS 604A.050(2)(a) states that as a part of the overall transaction, the lender will "[p]rovide[ ] to the customer an amount of money that is equal to the face value of the check [held as security] . . . *less any fee charged for the transaction.*" (Emphasis added.) Accordingly, by its terms, a deferred deposit loan transaction encompasses more than simply the amount borrowed but also includes some consideration to the lender beyond the customer's promise to repay the amount borrowed. Moreover, the amount of a deferred deposit loan must be fixed by the value of the entire loan transaction, including principal, fees, and interest, because NRS 604A.050 unambiguously defines a deferred deposit loan as "a transaction."

In light of the statutory definition provided by NRS 604A.050 for "deferred deposit loan," we hold that NRS 604A.425 unambiguously limits the total amount of a deferred deposit loan transaction—comprised of principal, interest, and any additional fees—to 25 percent of a customer's expected gross monthly income.

Check City relies on *Black's Law Dictionary*'s since-revised definition of a "loan" to argue that the unambiguous meaning of "loan" is nothing more than the amount borrowed.[3] When examining the plain

---

[3]Check City cites the sixth edition of *Black's Law Dictionary*, which defines a "loan" as:

> A lending. Delivery by one party to and receipt by another party a sum of money upon agreement, express or implied, to repay it with or without interest. Anything furnished for temporary use to

*continued on next page...*

 

meaning of a statute, "we presume that the Legislature intended to use words in their usual and natural meaning." *McGrath v. State, Dep't of Pub. Safety*, 123 Nev. 120, 123, 159 P.3d 239, 241 (2007). Even if we were to accept Check City's interpretation of the usual and natural meaning of the word "loan," that definition would conflict with the Legislature's statutory definition. Specifically, NRS 604A.080 defines "loan" by referring the reader to NRS 604A.050's definition of deferred deposit loan.[4] In such a case, the statutory definition must govern. *Williams v. Clark Cnty. Dist. Attorney*, 118 Nev. 473, 485, 50 P.3d 536, 544 (2002) ("A statute's express definition of a term controls the construction of that term no matter where the term appears in the statute.").

Thus, we conclude that NRS 604A.425's 25-percent cap on deferred deposit loans includes both the principal amount loaned and any interest or fees charged. NRS 604A.050 defines the phrase "deferred deposit loan" to include principal, interest, and fees, not just the principal

---

...*continued*

> a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use.

*Black's Law Dictionary* 936 (6th ed. 1990) (citations omitted). The most recent edition defines a loan as "1. An act of lending; a grant of something for temporary use .... 2. A thing lent for the borrower's temporary use; esp., a sum of money lent at interest ...." *Black's Law Dictionary* 1019 (9th ed. 2009).

[4]"'Loan' means any deferred deposit loan, high-interest loan or title loan, or any extension or repayment plan relating to such a loan ...." NRS 604A.080.

amount borrowed, and neither NRS 604A.425 nor NRS 604A.050 is ambiguous. Accordingly, we reverse the district court's order granting summary judgment.[5]

_____, J.
Parraguirre

We concur:

_____, C.J.
Gibbons

_____, J.
Pickering

_____, J.
Hardesty

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Saitta

_____

[5]The FID argues that Check City has not exhausted its administrative remedies and that this matter does not present a justiciable case or controversy. We disagree. Exhaustion is not required where, as here, the only issue is the interpretation of a statute. *Malecon Tobacco, LLC v. Dep't of Taxation*, 118 Nev. 837, 839, 59 P.3d 474, 475-76 (2002). Additionally, the possibility of a license suspension—a consequence Check City might have faced if it failed to comply with the FID's interpretation of NRS 604A.425—may constitute irreparable harm for the purpose of granting a preliminary injunction, *see Dep't of Bus. & Indus., Fin. Insts. Div. v. Nev. Ass'n Servs., Inc.*, 128 Nev. ___, ___, 294 P.3d 1223, 1228 (2012), which would be sufficient to form a justiciable case or controversy, *see Doe v. Bryan*, 102 Nev. 523, 525, 728 P.2d 443, 444 (1986).